**STATE of Tennessee, Appellee,**

v.

**Raymond Roger JONES, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Feb. 20, 1987.

Permission to Appeal Denied by Supreme Court May 18, 1987.

W.J. Michael Cody, Atty. Gen. & Reporter, Gordon W. Smith, Asst. Atty. Gen., Nashville, Tennessee, William R. Mooney, Kent W. Garland, Asst. Dist. Attys. Gen., Johnson City, for appellee.

Mark D. Slagle, Carter & Slagle, Anthony A. Seaton, Johnson City, for appellant.

## OPINION

ARTHUR C. FAQUIN, Jr., Special Judge.

This is an appeal as of right by Raymond Roger Jones from his convictions by a jury in the Criminal Court of Knox County on July 28, 1984, of two counts of murder in the first degree for the murders of his brother, Stanley Jones, and his brother's wife, Jean Jones. His punishment was fixed at life imprisonment in each case, and the sentences were ordered to be served consecutively by the trial judge.

The case originated in Washington County, Tennessee, with the untimely disappearance of Stanley and Jean Jones in August of 1982. After the arrest of the appellant, Roger Jones, and the discovery of Stanley's and Jean Jones's bodies, a motion to suppress the evidence of that discovery was granted, and the venue was changed. Another change of venue was granted after a mistrial, and the case was tried in Knox County, with the resulting convictions as set out above.

Upon his appeal to this Court, the appellant has presented ten issues for our review. They question: (1) the allowance into evidence of a lead bullet found in the victims' home; (2) the failure of the trial

court to enunciate guidelines for the cross examination of the State's witnesses; (3), (4), and (5) three issues questioning the sufficiency of the convicting evidence; (6) the failure of the trial court to suppress the taped conversation between the defendant and the witness Chester Allen; (7) the granting by the trial court of an ex parte conference with the assistant district attorney general after the trial had begun; (8) the trial court's imposition of consecutive sentencing upon the conviction of the defendant; (9) the failure of the trial court to grant a mistrial after a comment by the assistant district attorney general during voir dire regarding the defendant's right to testify; and (10) the allowing into evidence of testimony regarding the trailing of the defendant by a dog.

We do not find merit in any of appellant's issues, therefore we uphold the judgment of the trial court. For practical considerations, we shall first review appellant's third, fourth, and fifth issues concerning the sufficiency of the convicting evidence.

In these three issues, the appellant contends that the trial court erred in denying his motion for a judgment of acquittal at the close of the State's proof. In essence, the appellant argues that the evidence was circumstantial and that the State was unable to establish the corpus delicti of the crimes charged, or prove that the appellant was guilty of murder in the first degree beyond a reasonable doubt.

The State's proof shows that Stanley and Jean Jones disappeared from their Washington County home on or about Friday, August 13, 1982. Because of Jean's failure to report for work on the following Monday and Tuesday, the manager of her department took action, which resulted in an investigation being initiated and an extensive two-month-long search being made, culminating in the arrest of the appellant on September 23, 1982, and the discovery of Stanley's and Jean's bodies on October 13, 1982.

The appellant did not testify or offer any proof.

As has been stated above, the evidence concerning the discovery of the bodies was suppressed upon motion of the appellant.

Because of the involvement in this case of a piece of land owned by Stanley, which was about four miles, by road, from the property on which he and Jean were living when they disappeared, we feel it is appropriate to relate the following information concerning that property.

According to the evidence, Stanley and his three brothers, the appellant Roger, Clyde, and Keith grew up on a farm in Washington County, which was referred to in the record as the "home place." Keith was killed in Vietnam, but Clyde was still living at the time of this occurrence.

Some years prior to Stanley's disappearance, the "home place," as a result of a lawsuit, had been divided among Stanley, Roger, and Clyde. From what we glean from the record, Roger received the part of the farm with the "old Jones's home" on it and was living there with his family when he was arrested. Stanley, as his share, received approximately thirty-five acres of the farm adjacent to Roger's land upon which there was an abandoned schoolhouse and an abandoned church building. It was on this property of Stanley's that a woman's screams and shots were heard on the Sunday following his disappearance, and it was under this schoolhouse that what appeared to be a vacant grave was located during the search.

In the eight to ten years that Stanley and Jean had lived in the century-old log house from which they disappeared, they had been restoring it as time and money permitted, and they were getting ready to put a new roof on it at the time they disappeared. The plywood and the roofing had already been purchased and were stored in the barn.

In anticipation of a visit by Jean's sister in July, 1982, Ms. Viola Ferguson and Stanley spent the whole month of June cleaning and decorating each room of the house. When Ms. Ferguson went through it with her daughter on the last Sunday of July, everything was still as she had fixed it.

Stanley and Jean kept three vehicles at the house. One was an orange Datsun station wagon, another was a gray 280–Z Datsun car, and the third was a white pickup truck. At the time they disappeared, the pickup truck was in the shop having its transmission rebuilt, and only the 280–Z Datsun was seen at the house after Friday, August 13, 1982.

Stanley farmed, raised cattle, and sold tobacco.

Jean worked for the Tennessee Eastman Company, where she had been employed for nineteen years.

When they disappeared, both left money in active bank accounts, and Jean left money in an active savings account with the Credit Union at Eastman. She was also involved in the savings and investment plan and the stock-option plan of the Employee Benefits department.

Both were planning to attend an open house on the Sunday following their disappearance, and Jean was planning to take a vacation trip to Denver. Her airline ticket for the trip arrived in the mail after her disappearance. It showed that it was issued on August 12, 1982, which was a Friday and was the last day Stanley and Jean were seen alive. Their disappearance was not foretold to any of the numerous witnesses who testified and none of the witnesses received any communication from either of them after their disappearance.

Friends and neighbors of theirs were in agreement that they had never known of either Stanley or Jean leaving unannounced and going on a long trip and being out of communication for any length of time. If they were going to be gone for a while, they would always let someone know, because the cattle and the pets had to be fed, watered, and otherwise taken care of. Usually they would leave their house key with their next door neighbors, Mr. and Mrs. Clifford Martin, which was not done on this occasion.

During July, 1982, Jean's sister visited them for a week. She testified that Stanley and Jean had a "real good" relationship with each other and the only difference that she noticed about their physical or mental health from what it had been over the years was that Stanley had a sinus problem and had headaches quite often.

Their neighbor, Sam Ford, testified that he last saw Stanley on Tuesday, August 10, 1982, and he appeared to be in good health and did not seem to be disturbed.

During the week ending with their disappearance, a number of people saw or talked with Stanley and Jean. Jean, it appears, was last seen by Sam Ford at about 5:00 p.m. that Friday, August 13, 1982, as she was driving home from work in the orange Datsun station wagon. And Stanley was last seen that day by J.L. Baines, the mechanic working on his pickup truck, at his shop.

Stanley had been negotiating all of that week with Ira Tom Allen for the sale and trade of some cattle and was to consummate the sale at his (Stanley's) place on Saturday, August 14, 1982. However, Stanley failed to appear at the appointed time, and although he had already received a check from Mr. Allen, he never cashed it. When Mr. Allen could not locate Stanley or anyone else on the premises, he left a note on the antenna of Stanley's 280–Z Datsun, which was parked there, but the note was still on the car when Mr. Allen made two trips by Stanley's house over the next few days. He saw no activity there, and when he attempted to reach Stanley by numerous telephone calls, he got no answer.

Mr. Baines was to have had Stanley's pickup truck ready on Saturday, August 14th, but needed parts, so Stanley put one of the old parts in his 280–Z Datsun and was to go by the junkyard and purchase the necessary parts. When Mr. Baines did not hear from Stanley, he went by his house on Monday, August 16, 1982, and saw the part still in Stanley's car. No one was home.

On Sunday, August 15th, a neighbor of the appellant's was in her yard when she heard voices and a shot coming from between the appellant's house and the abandoned schoolhouse on Stanley's property at the "home place." She first heard a wom-

an's voice screaming, "Help! Help! Please, help me!" Next, she heard the voices of two people talking. The first of these two voices sounded like a woman's voice but was different from the voice she had heard screaming. This voice asked, "What are you going to do now?" The next voice that she heard she recognized to be the appellant's voice, and it responded, "I will take care of it." Then she heard a shot, and being alone, she went back inside her house. Her husband, who came outside through another door at about this same time, also heard a shot but did not hear any voices.

Later that day, at about 4:00 p.m., the neighbor saw Stanley's orange Datsun station wagon parked between the back door of the appellant's house and his garage, and a couple passing his house later that afternoon saw the station wagon in the yard in front of the appellant's house, backed in with its rear hatch up. The station wagon was again seen at the appellant's house on Tuesday, but it was gone on Wednesday. On August 26, 1982, members of the sheriff's department went to Abingdon, Virginia, and saw the station wagon where it had been found abandoned on the parking lot of the Empire Motor Lodge.

On Monday, August 16th, Stanley failed to keep an appointment with his lawyer, and Jean did not report for work and did not give the necessary notice of her absence to her employer, as was normally done.

On Tuesday, Stanley failed to keep an appointment with his dentist, and, again, Jean did not report for work or give the necessary notice of her absence. Her department manager, who was already concerned, became more concerned and went to Stanley's and Jean's home in an attempt to locate them. After being unsuccessful in this effort and after talking with neighbors, he called the sheriff's department, and an investigation was initiated and the search was begun.

Although cursory searches of the victim's residence showed no signs of violence, a close analysis by the crime lab team revealed blood stains on a chair,[1] the carpet, a wicker table and the kitchen floor. A bullet hole was found in a table leg.[2] Two lead bullet fragments were found in the carpet; a spent bullet was found inside a boot and another embedded in the kitchen wall. Several areas of the linoleum kitchen floor revealed type "A" blood, consistent with what medical records proved to be the blood type of Stanley Jones. Type "O" blood was found on the carpet. Although no records were available to prove Jean Jones' blood type, a sanitary napkin was found in the trash stained with type "O" blood.

There was evidence that an empty grave had been dug beneath the floor of the old schoolhouse on Stanley's property. The hole was five feet, ten inches long; three feet, eight inches wide; and five feet deep. It was covered by boards, and it was adjacent to a pile of dirt that was covered by a tarpaulin, which had dry dirt over it. Nearby, there were paper bags filled with dirt. A flashlight, which still worked, was found on the schoolhouse floor. It had the appellant's fingerprints inside on a battery and on the reflector. There was also evidence offered by the State that some two months after the victims' disappearance, a tracking dog picked up the appellant's scent in the orange Datsun belonging to the victims, at the parking lot where the car was found, at the schoolhouse, and in the victims' residence.

Perhaps the most damning evidence against the appellant was the testimony of his friend Chester Allen. Mr. Allen testified that on Monday, August 16, 1982, the appellant came by his home and asked him to keep a Walther P–38 pistol for him. He also made incriminating statements concerning Stanley and Jean to Mr. Allen, such as, "There's a good chance that Stanley won't show up, again," and referring to a conversation he had with a third party,

---

1. and 2. Ms. Ferguson's testimony reveals that she had cleaned the table and the chair in June, 1982, and the hole was not in the table leg at that time and she did not notice anything on the rungs of the chair.

"You know, he remembered that bastard, Stanley." The appellant also told Mr. Allen that he had taken the pistol to a gunsmith in Johnson City, and using a man's name in North Carolina, he had the front sight worked on and the gunsmith got him some ammunition for it. While the appellant was at Mr. Allen's, he cleaned the pistol, which Mr. Allen noticed was loaded with solid copper jacket bullets. When Mr. Allen was alone with the pistol, he unloaded it and wrote its serial number down and later sent the serial number to the Sheriff's offices. The appellant hid the pistol in Mr. Allen's barn, but the next day, he came by, at Mr. Allen's request, and picked it up.

On this occasion, when Mr. Allen expressed concern about the pistol, the appellant made additional incriminating statements. Among those, he told Mr. Allen, "Let me tell you, there is nothing to be worried about," and "Everything's been taken care of." Referring to Stanley and Jean, he said, "They are not coming back now or never," "there's nothing to be afraid of." When Mr. Allen asked the appellant if the gun had anything to do with it, he responded, "If it didn't, why would I want to be gettin' rid of it?"

Sometime later, Mr. Allen went to the law enforcement officers and explained what had happened. He also agreed to be wired for a conversation with the appellant. In the course of the conversation with the appellant, the appellant again made a number of incriminating statements, including telling Mr. Allen not to worry about fingerprints being on the gun or the box it was in, because he had wiped both the gun and the box off and had buried the box with the gun in it in a barn stable, where no one could find them. He also said that Stanley was going to take his place from him. In addition he commented that, "I cannot say that I don't hate this thing happened—that Stanley's gone." And when he was asked if they had gone on a vacation, the appellant responded, "permanently, yeah." He also said that, "When it really comes down to your family ... everybody has a breaking point."

After the officers heard the tape of the appellant's and Mr. Allen's conversation, they searched numerous barns, using a metal detector, until they located the pistol.

The gunsmith who had repaired it in May, 1982, identified it, and a ballistic expert testified that the bullets found in the boot and the wall of the victims' home were fired from it.

■ The evidence suggests that Roger Jones had a motive for killing his brother and sister-in-law. He had experienced difficulties with his brothers Stanley and Clyde relating to a dairy farming partnership. Roger had also defaulted on a loan which had been co-signed by his brothers. As a result, Stanley had been involved in a lawsuit against Roger, had recovered a judgment against Roger and was contemplating foreclosure on the appellant's home. A critical stage of this lawsuit occurred in the last of May, 1982, which is about the same time the gunsmith repaired the pistol.

It is well settled that the corpus delicti may be proven by circumstantial evidence. *Clancy v. State*, 521 S.W.2d 780, 783 (Tenn. 1975). Similarly, the elements of first degree murder may be established circumstantially. *State v. Bullington*, 532 S.W.2d 556, 560 (Tenn.1976). In the instant case, the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." *State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983).

The jury's verdict has removed the defendant's presumption of innocence and has raised a presumption of guilt upon appeal. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973). Where the sufficiency of the evidence is challenged, the relevant question for the appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 2782, 61 L.Ed.2d 560 (1979); T.R.A.P. 13(e). The standard of review on appeal is the same for circumstantial evidence cases as for all other cases. *See*

*State v. Brown,* 551 S.W.2d 329, 331 (Tenn. 1977); *State v. Delk,* 692 S.W.2d 431, 435 (Tenn.Crim.App.1985).

We are of the opinion that, when the evidence in the present case is viewed in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of murder in the first degree beyond a reasonable doubt. We find that the proof before us is sufficient to meet the *Jackson* test. Given the weight of evidence against the appellant, the trial court properly denied the motion for acquittal. *See State v. Thompson,* 549 S.W.2d 943 (Tenn.1977). Issues three, four and five are overruled.

■ The appellant's first issue questions whether the trial court erred in allowing into evidence the lead bullet found in the wall of the kitchen.

The appellant made a statement to an inmate which led police to the discovery of the buried bodies of the victims. And the trial court suppressed all evidence obtained as result of the victims' bodies being found due to a violation of the appellant's Sixth Amendment right to counsel.

Found in the grave was a tube of bathtub caulk, which prompted investigators to return to the victim's home. As a result, officers found a spent bullet which appeared to have been fired from the murder weapon. The bullet, which had been overlooked during prior inspections of the house, was embedded in a wall masked over with the caulking. The appellant contends the bullet is inadmissible as "fruit of the poisonous tree."

Although the record establishes that the bullet was found as a result of evidence revealed by the discovery of the victims' bodies, the trial court ruled the bullet was admissible because the defendant had "opened the door" by certain testimony elicited by the defense during the trial. Specifically, with the cross examination of various witnesses, the defense sought to show that there were other explanations for the disappearance of the victims other than their violent death.

If the trial court erred in its ruling, it was harmless. Rule 36(b), Tennessee Rules of Appellate Procedure. Another spent bullet was found inside the victims' residence and was determined to have been fired from the appellant's Walther P-38. Given this and the weight of the remaining evidence against the appellant, the admission of this bullet did not prejudice the appellant. The issue is without merit.

■ In his second issue the appellant contends that the trial court erred by failing to enunciate guidelines for cross-examination of the State's witnesses.

Whether to make an advance ruling on evidentiary matters is within the discretion of the trial court. *See State v. Martin,* 642 S.W.2d 720 (Tenn.1982). Clearly, the trial court could not foresee in advance of trial all possible defense queries which might open the door to the State. Neither does the trial court have a responsibility to advise defense counsel as to how to proceed with his case.

We find the issue to be without merit. The appellant has failed to demonstrate any abuse of discretion by the trial court. Furthermore, the appellant cites no specific instance where he was prejudiced by the court's ruling.

■ Appellant's sixth issue maintains that it was error for the court to overrule his motion to suppress the taped conversation between the appellant and Chester Allen.

Chester Allen, an acquaintance of the appellant, became suspicious that appellant was involved in the sudden disappearance of the victims when thereafter appellant asked him to keep a handgun for him for a period of approximately 24 hours. Allen went to officials, who convinced him to be "wired" for the purpose of tape recording a conversation with the appellant. The tape conversation took place, in which appellant made several incriminating statements. Appellant contends that the tape recording was obtained in violation of his Sixth Amendment right to counsel. We cannot agree.

The Sixth Amendment right to counsel attaches when "adversary judicial proceedings" are initiated. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn.1980). In the instant case, the taped conversation was made during the investigative stage of the case and prior to the appellant's arrest. Appellant's conversation was in a non-custodial environment. Furthermore, tape recordings of the appellant's conversations with a person who had consented to the recording and made at a time when there had not been a "criminal prosecution" did not violate the appellant's Sixth Amendment right to counsel. *Craig v. United States*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 110 (1978). Whether the police knew that appellant was represented by counsel at the time of the recording is irrelevant. The issue is without merit.

Next, appellant contends that the trial court erred by granting the assistant district attorney general an ex parte conference after the trial had begun.

█ Shortly following voir dire and in the midst of a heated exchange concerning a procedural disagreement between counsel, the prosecutor requested an ex parte conference with the trial judge in chambers. Over defendant's vigorous objection, the trial judge granted the conference after being assured by the State that the purpose for the conference was to discuss matters not pertaining to the instant case. The appellant asserts that the trial court erred in granting the conference. We cannot agree for several reasons.

First, Supreme Court Rule 10, Canon 3, subd. A(4) provides that a judge shall not engage in ex parte communications concerning a pending or impending proceeding. In the instant case, the trial court reassured defendant that the ex parte conference did not involve matters related to this case. Secondly, appellant has failed to demonstrate any prejudice resulting from the conference. Thirdly, as the matter

transpired entirely out of the presence of the jury, any error would be harmless in this instance. Rule 36(b), Tennessee Rules of Appellate Procedure. The issue is without merit.[3]

█ In the appellant's eighth issue, he questions whether the trial court erred in imposing consecutive sentencing after the jury had convicted him of two counts of murder in the first degree and had fixed his punishment at life imprisonment in each case. We think not.

The law is well settled that consecutive sentences may be imposed consistent with the criteria set forth in *Gray v. State*, 538 S.W.2d 391 (Tenn.1976). The trial court, in this instance, found the defendant to be a "dangerous offender" under *Gray v. State, supra*. The record supports that finding.

A defendant may be classified as a dangerous offender if the crimes for which he is convicted indicate that he has little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. The decision to impose consecutive sentences should be based upon the presence of aggravated circumstances. *Gray v. State, supra* at 393.

Here, the proof showed that the appellant attacked the victims in their own home. The appellant made considerable effort to conceal the evidence of the crime. The evidence strongly suggests that the appellant held Mrs. Jones hostage for two days, then shot her while she begged for help. In view of these aggravated circumstances, the trial court did not abuse his discretion in imposing consecutive sentences. The issue is overruled.

In his ninth issue, the appellant contends that the trial court erred in failing to grant a mistrial after the assistant district attorney general, during the voir dire of the jury, commented on his right not to testify.

He argues that "During the jury selection, defense counsel qualified the prospective venire by asking certain questions as

---

**3.** On the other hand, we do consider the trial court's decision to grant the ex parte conference under the circumstances to be lacking in judgment. Moreover, in light of the professional and ethical consideration requiring all attorneys to avoid even the appearance of impropriety, we find the conduct of the prosecution in requesting an ex parte conference under these circumstances to be totally reprehensible.

to whether or not they would require a Defendant to testify even though he had a right not to do so. In response, the prosecutor also, for purposes of drawing attention to that fact, ask (sic) them if they would likewise not hold it against the Defendant if he did not testify."

Our reading of the record does not leave us with the impression that the prosecutor addressed his questions on this issue "for the purposes of drawing attention to the fact" that the defendant is not required to testify.

On the contrary, it appears to us that the prosecutor addressed this issue in attempting to ask the jury if they could base their verdict solely upon the evidence presented to them, "without consideration to the fact that the defendant doesn't testify, if he doesn't." Considering that the defense had already brought up the issue of the defendant's right not to testify, and no prejudice was shown from this line of questioning, we find no error in this issue.

■ Nor do we find error in the prosecutor's questioning of the prospective jurors concerning whether they could consider, under certain circumstances, the failure of the defense to call certain witnesses who might be helpful to the defense. Statements in the record reveal this latter line of questioning was aimed at the missing witness rule. Since, under certain circumstances, the failure of the defense to call certain available witnesses gives rise to an inference that the testimony of those witnesses would not sustain the defendant's contentions, we find no error in this questioning. *See State v. Jones*, 598 S.W.2d 209, 224 (Tenn.1980). We find no merit in the appellant's ninth issue.

In his final issue, the appellant contends that the trial court erred in admitting evidence of the tracking of the appellant by a dog.

■ The trial court allowed evidence that a trained German shepherd dog tracked the appellant's presence around the deceased's residence, at the schoolhouse on the appellant's property, and at and around the deceased's vehicle some sixty days after the disappearance of the victim. The appellant asserts that the State failed to lay a proper foundation for the evidence; that the dog was not placed on the track within its period of efficiency.

One of the requirements for the admission of this type of evidence is the showing that the dog was placed upon the trail within its period of efficiency. *State v. Barger*, 612 S.W.2d 485, 492 (Tenn.Crim. App.1980). In this case, the dog's handler testified that the dog had been utilized and proven reliable in excess of one hundred cases where the tracks were sixty to seventy days old, as here. In view of the handler's testimony, the trial court's finding that a proper foundation was laid for the admission of the evidence was warranted. The issue is overruled.

As all issues raised by the appellant are found to be without merit, the judgment of the trial court is affirmed.

DWYER and TATUM, JJ., concur.