IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JANUARY 1996 SESSION

FILED

May 19, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9412-CC-00408 |
| | ) | |
| | ) | Montgomery County upon change of venue |
| | ) | from the Twenty-Fourth Judicial District |
| v. | ) | |
| | ) | Honorable Julian P. Guinn, Judge |
| | ) | |
| STACY DEWAYNE RAMSEY, | ) | (First Degree Murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Matthew M. Maddox
D. D. Maddox
105 East Main Street
P.O. Box 430
Huntingdon, TN 38344- 0430

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
    and
William David Bridgers
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Robert G. Radford
District Attorney General
    and
Elenora Cahill
Assistant District Attorney General
111 Church Street
P.O. Box 686
Huntingdon, TN 38344-0686

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Stacy Dewayne Ramsey, appeals as of right from a jury conviction in the Circuit Court of Montgomery County[1] for first degree murder and sentence of life imprisonment without the possibility of parole. At the sentencing hearing, the jury found the existence of two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death and the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. See T.C.A. § 39-13-204(i)(5) and (6). The defendant contends that:

> (1) the trial court lacked jurisdiction to convict the defendant because an order of interchange was never entered;
>
> (2) he was convicted based upon the uncorroborated testimony of a codefendant;
>
> (3) the trial court erred by overruling his motion to suppress statements he gave to police;
>
> (4) the trial court erred by allowing the introduction of evidence during the guilt and sentencing phases concerning the defendant's mutilation and disposal of the victim's body;
>
> (5) the trial judge erred by refusing to recuse himself from hearing the case;
>
> (6) the trial court erred by denying the defendant's motion challenging the constitutionality of the felony murder statute when it is read in conjunction with the statutes allowing for a conviction based upon criminal responsibility for the conduct of another and for the facilitation of a felony.
>
> (7) the trial court erred by excusing an impaneled juror after testimony had begun;
>
> (8) the trial court erred by denying the defendant's special requests for jury instructions on duress and diminished capacity and by instructing the jury regarding diminished capacity in the manner that it did; and

---

[1] The defendant's initial motion to change venue was granted, and venue was changed from Carroll County, the county in which the offense occurred, to Henry County. A subsequent motion to change venue was also granted due to publicity surrounding the trial of Teresa Deion Smith Harris, a codefendant, and venue was changed from Henry County to Montgomery County.

> (9) the evidence is insufficient to support the aggravating circumstances.

We affirm the judgment of conviction.

On July 30, 1993, at approximately 7:00 p.m., police officers discovered a truck belonging to Dennis Brooks, Jr., on a dirt road in an isolated part of Carroll County near the residence of the defendant and Teresa Deion Smith Harris[2]. The truck was on fire with the severely charred body of Dennis Brooks, Jr., inside it. The victim had been shot in his left hip and under his chin. The victim's body had also been dismembered and stabbed. The radio, the speakers and other items belonging to the victim had been taken from the truck.

Alvin Daniels, an agent with the Tennessee Bureau of Investigation (TBI), testified that the truck was moved to the jail after the fire went out. He said that the victim's body was then removed from the truck. He stated that it was apparent that the victim's legs had been cut off, with one being on the passenger side of the truck and the other being under the victim's body. Agent Daniels testified that he interviewed the defendant the next morning. He said that he noticed blood on the shoes that the defendant was wearing. He stated that when he questioned the defendant about the blood, the defendant told him that it was deer blood. Agent Daniels testified that he searched the defendant's residence with the defendant's permission. He said that he found a .20 gauge, single shot shotgun at the defendant's residence and a shaving kit containing tools in a barn located on the defendant's property. He stated that the shotgun had to be cocked manually each time it was fired. Agent Daniels found several items belonging to the victim at Harris' residence, including two Mexican coins, one Grover Cleveland coin, and the truck radio and speaker. He also found two butcher

---

[2] The defendant, Harris, and Walter Steve Smothers were jointly indicted for the first degree murder of Dennis Brooks, Jr. Before Harris' trial, Smothers entered a guilty plea to first degree murder and was sentenced to life without the possibility of parole. Pursuant to the agreement, Smothers testified against Harris and the defendant. Harris was tried separately and was convicted by a jury of first degree murder and sentenced to life without the possibility of parole.

knives, a shovel, an ax, a five-gallon gasoline tank at her residence and red droplets on the walkway to the shed behind her house. Agent Daniels testified that he discovered stains that appeared to be blood on Parrish Road, a narrow gravel road in an isolated part of the county near the location where the truck was discovered by police.

May Dill, the manager at a Subway Restaurant, testified that the victim was an employee at the restaurant and that he was closing the restaurant on the night that he was killed. She said that she spoke to the victim on the telephone at approximately 12:25 a.m. on July 30, 1993.

Officer David Bunn of the Carroll County Sheriff's Department testified that he responded to a call from Keith Knowles on July 30 that he had heard voices coming from the road near his residence followed by a gunshot. He stated that when he arrived, he discovered red spots on the road and the defendant's truck parked on the side of the road. He said that the truck had a flat tire and the hood of the defendant's truck was still warm. Officer Bunn testified that a search for the victim was conducted after the victim's father reported the victim and his truck missing. He stated that the victim's truck was discovered by police, and he described the discovery of the victim's body in the burned truck.

Keith Knowles testified that he was awakened at 12:30 or 1:00 a.m. by people talking near the road approximately sixty to seventy feet from where he lived. He said that he saw the taillights of a vehicle stopped in the road. He stated that he heard someone ask to borrow ten dollars and a male voice responded that he had it covered. Mr. Knowles testified that he then heard the motor of the vehicle speed up and a man curse and say that if the person moved the truck, he would blow the person's head off. He said that the man asked the person in a loud voice two more times whether the person heard what he was saying. Mr. Knowles stated that he then

4

heard a gunshot followed by a scream by a woman. He said that the truck then drove away and he heard the woman yell, "Lay down. Lay down, M.F., lay down." Mr. Knowles testified that he saw what appeared to be blood in the road when he walked to the road. His wife testified similarly.

Walter Smothers, a codefendant, testified that he had dated Teresa Deion Smith Harris for approximately one month and had lived with her for approximately one week before the offense occurred. He said that he, Harris and the defendant spent the day drinking beer and whiskey and taking Valium at Harris' house. Smothers stated that he argued with David Hampton, Harris' ex-boyfriend, on the telephone. He testified that Harris asked him and the defendant to find Hampton and to hold him down so that she could beat him up as Hampton had beaten her on earlier occasions. He stated that they agreed, and the defendant took a gun that he had brought to Harris' house with him in the defendant's truck. Smothers said that they then dropped Harris' children at their grandmother's house.

Smothers testified that before they arrived at Hampton's residence, the defendant's truck began overheating, requiring them to stop along the road at approximately 12:00 or 1:00 a.m. He stated that they discussed a plan to take the next vehicle that came along. He said that they also discussed the possibility that they would have to kill the driver. Smothers testified that as the victim's truck came down the road, Harris stood in the middle of the road to flag the victim down while Smothers and the defendant stood on the other side of the road out of sight. He stated that when the victim stopped the truck, he pointed the gun at the victim and told him to get out of the truck. He said that the defendant then grabbed the victim and threw him to the ground, and he stated that Harris slapped the victim, cursed him, and told him to shut up. Smothers said that the victim became quiet.

5

Smothers testified that he got into the back of the truck with the victim. He stated that the defendant drove the truck and Harris sat in the passenger seat holding the gun on the victim through the rear sliding glass window of the truck. Smothers testified that when the defendant sped up at one point, Smothers grabbed for the gun and it accidentally discharged, hitting the victim in his left hip. He said that the victim began screaming but Harris told the victim to shut up. He also said that they told the victim that they would take him to the hospital. He stated that the victim began screaming again as they neared security lights or street lights within the city limits. Smothers claimed that he heard a voice tell him to shoot the victim, although he did not know whether he was hallucinating or someone in fact said to shoot the victim. He stated that he then took the gun, pointed it at the victim's chin, and shot the victim again. Smothers believed that the second shot killed the victim.

Smothers testified that as they were driving towards Harris' residence, they were pursued by a police car but the defendant was able to evade the officer and return to Harris' residence. He said that they then took the radio and some coins from the victim's truck. He stated that they decided to bury the victim. Smothers testified that the defendant initially suggested that they use a backhoe to bury the truck as well as the victim, but the backhoe had a flat tire. He said that the defendant retrieved an ax and a shovel from his residence and Harris obtained a butcher knife from her residence. He stated that they then drove the truck to a secluded area located near a bridge. Smothers testified that while there, they decided to cut off the victim's legs to make it easier to bury him. He said that before cutting off the victim's legs, the defendant took the shoes off the victim's feet. Smothers said that he and the defendant each cut off a leg with the ax. He claimed that he did not tell the defendant to cut off the victim's leg. Smothers said that Harris then stated that she wanted the victim's heart, and he removed the victim's heart for her. He said that Harris then held the victim's heart to her mouth. Smothers testified that he and the defendant also held the

6

victim's heart up to their mouths at the request of Harris. He also said that they each took turns stabbing the victim with the butcher knife. Smothers stated that the defendant also took a tool kit from the victim's truck.

Smothers testified that they returned to Harris' residence and retrieved oil and gasoline to burn the victim's body and the victim's truck. He said that at approximately 2:30 or 3:00 a.m., he drove the victim's truck approximately one to two miles away, with the defendant riding with him and Harris following in her own car. They poured gasoline on the truck, set it on fire, and then went back to Harris' residence where they showered and Harris washed their clothing.

Smothers stated that they went to get the defendant's truck at approximately noon but the truck had a flat tire and would not crank. They returned later and towed the truck to the defendant's residence. Smothers said that the three concocted a story to tell the police if they were questioned.

On cross-examination, Smothers testified that Harris was more in command than anyone else. He stated on redirect examination that Harris did not order the defendant to grab the victim and throw him to the ground, to drive the victim's truck, to chop off the victim's legs, or to take the victim's personal belongings. He said that when Harris stated that they would need a gun if they were going to Hampton's residence, the defendant retrieved the shotgun.

Dr. Obrien Smith, a pathologist, testified that he examined the charred remains of the victim that were found in the truck and that he identified the victim through his dental records. His examination revealed that the victim suffered two shotgun wounds, one to the left hip, causing damage to the intestines and large blood vessels, and the other under the chin, causing damage to the head and neck. He said

7

that a pellet also penetrated the victim's lung. Dr. Smith's examination showed that the victim also suffered stab wounds to the right side of the abdomen and to the liver. Dr. Smith testified that the victim's chest had been opened and the heart removed. He stated that the victim's heart was found in the abdominal cavity. Dr. Smith said that both of the victim's legs, one of his arms, and his penis had been amputated.

In Dr. Smith's opinion, the shotgun wound under the chin could have caused the victim's death because of the damage to the spinal cord and the brain. He believed that the shotgun wound to the victim's left hip also could have been fatal, although it was less likely to cause immediate death. Dr. Smith testified that he could not determine which gunshot wound occurred first. He expressed the opinion that the stabbing, the dismemberment, and the charring occurred after the victim's death.

Officer Thomas Bridges, the chief of police for Hollow Rock, testified that as he was responding to a call, he saw a speeding truck. He stated that he pursued the vehicle but eventually lost it.

David Lee Hampton testified that he called Teresa Deion Smith Harris, his former girlfriend, the day before the victim was killed. He stated that he spoke to Harris and Walter Smothers on the telephone. He said that he argued with Smothers, and Smothers asked him to meet him to fight the following Monday and told him that he was going to beat him up.

The defendant testified, and his testimony was similar to that of Smothers, except he portrayed his role as a much more limited one. The defendant claimed that he was working on his truck when Harris and Smothers stopped the victim's truck. He testified that he did not know of any plan to stop and kill the driver of the vehicle. The defendant admitted that the shotgun Smothers used to kill the victim was his, but he

8

stated that he did not know that Smothers had taken it from the truck until after the victim was stopped. He stated that Smothers, who was holding the gun, told him to get in the truck and drive and then Smothers forced the victim into the back of the truck. The defendant said that he drove the truck because he was scared of Smothers. He stated that he did not believe that anyone would be killed. The defendant remembered hearing two gunshots and the victim pleading for his life, but he did not remember being pursued by a police car. The defendant denied that he participated in the mutilation of the victim's body. The defendant also denied taking anything from the victim. He denied having a conversation about using his father's backhoe to bury the victim and his truck, and he stated that he did not see anyone get an ax or a shovel. The defendant admitted that he helped place the victim's body in the seat of the truck before Smothers poured gasoline on the truck and set it on fire. The defendant testified that Smothers made up a story for them to tell police if they were questioned. He said that he initially told the police the concocted story. He also admitted that he was wearing the victim's shoes when he was arrested, but he claimed that Smothers took the shoes off the victim's feet and gave them to him.

Dr. Pamela Auble, a clinical psychologist, testified that she conducted an examination of the defendant. She stated that as part of her examination, she interviewed the defendant and reviewed the defendant's school records, his medical records, his birth records, transcripts of prior testimony in the Harris' trial, and transcripts of interviews of family members and co-workers of the defendant conducted by an investigator. Dr. Auble testified that she determined that the defendant was of low intelligence, having a full-scale IQ score of eighty-one. She said that testing of the defendant in 1982 and 1988 revealed full-scale IQ scores of eighty and seventy-two, respectively. Dr. Auble testified that the defendant's school records revealed that the defendant took some special education classes in middle school and high school. She

9

said that the defendant graduated fifty-eight out of a class of one hundred and that he passed the Tennessee Proficiency Test given in high school.

Dr. Auble stated that in her opinion, the defendant is not a violent person but is a very passive person who has problems standing up for himself. Dr. Auble said that the defendant is also shy, immature, and dependent on others. She described the defendant as being submissive and a follower. Dr. Auble testified that in her opinion the defendant was afraid of Smothers and was not capable of standing up to him because of his submissiveness and low intelligence. She said that the defendant had some problems remembering the events that occurred on the night of the offense. She believed the defendant was suffering from severe depression and a lot of anxiety because he had symptoms of a person who has been through a horrible event.

In rebuttal, Dr. Bernard Hudson, a psychiatrist, testified that he examined the defendant pursuant to a court order. In his opinion, the defendant was competent to stand trial and an insanity defense could not be supported. He stated that the defendant did not have a mental disease or defect. Dr. Bernard also said that the defendant denied any kind of psychiatric illness in the past or in the present. He testified that the defendant knew what was taking place when the offense occurred, knew that it was wrong, and knew that he had several choices.

In surrebuttal, Dr. Auble testified that although the defendant does not meet the standard for being insane, he suffers from a mental disease or defect in that he meets the criteria for a dependent personality disorder and post-traumatic stress disorder. On cross-examination, she explained that the defendant suffers from post-traumatic stress disorder as a result of the events that occurred on the night of the killing. She conceded that the defendant's post-traumatic stress has no bearing on the defendant's diminished capacity.

# I. JURISDICTION

The defendant contends that the trial court was without jurisdiction to try the case because no order of interchange was entered following the changes of venue. He asserts that it was necessary that an order of interchange be entered by a judge of the Circuit Court of Montgomery County. The defendant argues that the references to "the receiving court" in Rule 21, Tenn. R. Crim. P., implies that the judge for the district to which venue is changed will be different from the judge that originally had jurisdiction. The state responds that the trial judge retained jurisdiction because there is no requirement that an order of interchange be entered.

The trial judge in this case is a judge for the Twenty-Fourth Judicial District. Carroll County, the county in which the offense occurred, and Henry County, the county to which venue was initially changed, are two of the counties that comprise the Twenty-Fourth Judicial District. Montgomery County is not in the same judicial district as Carroll County and Henry County. Venue was changed from Carroll County to Henry County and from Henry County to Montgomery County. The trial judge presided over the defendant's case at all times. No order of interchange was entered.

At a bench conference during voir dire, the defendant objected to the trial court presiding over the defendant's case because no order of interchange had been entered by the Tennessee Supreme Court allowing the trial judge to sit by interchange. The trial judge overruled the defendant's objection.

The defendant also raised the issue in his motion in arrest of judgment filed after the judgment of conviction was entered. See Tenn. R. Crim. P. 34. At the hearing on the motion, the trial judge explained that once it became apparent that the case could not be tried in the judicial district in which he presided, he considered other counties and concluded that Montgomery County would be an appropriate venue to try

11

the defendant. The judge stated that he spoke to every circuit judge in Montgomery County and each judge agreed that the defendant's case could be tried in Montgomery County. The trial judge said that each judge could not preside over the defendant's trial due to scheduling conflicts but that the presiding judge of the district informed him that venue could be changed to Montgomery County as long as the trial judge presided over the case. He stated that venue was then changed with the understanding that the trial judge would continue to preside over the case. The trial judge overruled the defendant's motion, noting that the defendant had not been prejudiced.

At the time of the defendant's trial, T.C.A. § 17-2-201 (1994) (repealed 1997) provided the following:

> The circuit judges may interchange with each other or with judges of special courts for one (1) or more courts, or parts of courts, when causes exist making an interchange necessary, or for mutual convenience; and, in the absence of the judge of any circuit, the circuit judge's death, or inability to hold court, any circuit judge may hold court in such judge's stead.

This statute provides the authority by which the trial judge presided over this case. In this respect, there is no requirement that the record show that a judge is sitting by interchange. See State ex rel. Stall v. City of Knoxville, 211 Tenn. 271, 278-79, 364 S.W.2d 898, 902 (1962).

As for the defendant's claim that Rule 21, Tenn. R. Crim. P., relating to change of venue, indicates a trial judge in the receiving district is to try the defendant, we believe that it is irrelevant to the issue before us. The fact that a trial court in the receiving county is to hear the case under Rule 21 does not negate the fact that the trial judge could interchange with the judge of the receiving court pursuant to T.C.A. § 17-2-201 (1994) (repealed 1997).

In this case, the interchange was proper. The reasons provided by the trial judge establish that the scheduling conflicts of the other judges rendered it both necessary and mutually convenient that the trial judge try the defendant's case. An order of interchange was not required by law. Moreover, the defendant has failed to show how he was prejudiced by the failure to receive notice that the trial judge was sitting by interchange. The trial court had jurisdiction to try the defendant. This issue is without merit.

## II. SUFFICIENCY OF THE EVIDENCE

The defendant challenges the sufficiency of the evidence. He argues that he was improperly convicted upon the uncorroborated testimony of Smothers. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

In Tennessee, a conviction may not be based upon the uncorroborated testimony of an accomplice. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). An accomplice is an individual who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of an offense. State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The testimony of one accomplice may not be used to corroborate the testimony of another. Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978). Whether other evidence sufficiently

13

corroborates the testimony of an accomplice is a question of fact entrusted to the jury.

State v. Bigbee, 885 S.W.2d at 803. The general rule is that:

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

Hawkins v. State, 4 Tenn. Crim. App. 121, 133-34, 469 S.W.2d 515, 520 (1971).

We conclude that there is sufficient evidence to corroborate Smothers' testimony. Initially, the defendant testified in detail about his involvement in the crime. Also, the defendant was wearing the victim's shoes when he was arrested. The victim's shaving kit containing tools were also found in the barn located on the defendant's property two days after the murder occurred. In addition, Officer Bunn discovered the defendant's truck near the Knowles' residence where the shooting occurred and the truck had a flat tire, as testified to by Smothers. This evidence is sufficient corroboration.

### III.  SUPPRESSION OF STATEMENT

The defendant challenges the trial court's denial of his motion to suppress the two statements he gave to police. He argues that he did not give the statements knowingly, voluntarily, and intelligently because of his limited intellect. He also argues that the statement he gave to Agent Champine was obtained in violation of his Miranda rights because he invoked his right to counsel.

Before trial, the defendant filed a motion to suppress the statements he gave to police. At the hearing on the motion to suppress, TBI Agent Alvin Daniels testified regarding the first statement given by the defendant at approximately 8:00 a.m. on July 31, 1993. He said that the defendant was not under arrest when he and Agent Carpenter interviewed the defendant at the jail. He stated that he informed the defendant of his rights orally and then Agent Carpenter read the defendant his rights from the waiver of rights form and the defendant signed the form. He testified that the defendant denied the crime when questioned. He said that the defendant explained that he and Smothers went to Paris to cash a check on the evening of the offense. Agent Daniels stated that the defendant told him that they had to get a ride home because his truck broke down.

TBI Agent Steven Champine testified that on the afternoon of July 31, 1993, he arrested the defendant after a search was conducted at the defendant's house to investigate the defendant's claim that he had killed a deer. He stated that he explained to the defendant that he was being charged with murder and then placed the defendant in the police car. Agent Champine testified that as he and a deputy were transporting the defendant to the jail, he advised the defendant of his Miranda rights. He said that the defendant then gave a statement regarding his involvement in the crime. Agent Champine testified that once they arrived at the police station, he asked the defendant to put his statement in writing. He explained that he informed the defendant of his Miranda rights a second time, and the defendant gave a written statement.

Dr. Pamela Auble testified regarding the results of her psychological examination of the defendant. She said that the defendant had a full-scale IQ of 81 and poor reading, vocabulary and arithmetic skills and that his ability to express himself was within the retarded range. She stated that personality testing of the defendant

15

showed that he was somewhat immature. Dr. Auble testified that the defendant was not comfortable around people and that he did not relate to people very well. She described the defendant as being significantly depressed at the time of the interview. She stated that the defendant is intimidated by people in authority, including police officers, and that he would try to please them by doing what they wanted, even if it was to his own detriment.

Dr. Auble testified that when she questioned the defendant about the circumstances surrounding his statements, the defendant told her that he had gone to bed at approximately 11:30 p.m. the night before the interview but was awakened between 1:00 and 2:00 a.m. She said that the defendant told her that the police kept him in jail until around 8:00 a.m., when they questioned him for the first time. She stated that the defendant said that after the interview and after he consented to the search of his home, he was taken home and a search was conducted. The defendant was arrested later that day and gave a second statement after being read his Miranda rights. Dr. Auble testified that she did not believe the defendant fully understood that he could obtain counsel before giving the statement. She said that the defendant seemed more concerned about obtaining counsel after he gave the statement. She testified that she was not sure whether the defendant understood the importance of giving a statement. Dr. Auble stated that she questioned the defendant's ability to waive his rights knowingly and voluntarily given his limited intellectual capacity and his sleep deprivation.

On cross-examination, Dr. Auble conceded that she did not diagnose the defendant with a learning disability. She stated that the defendant was not retarded but he was within the low average intelligence range. She acknowledged that the defendant initially lied about his conduct but then confessed once he learned about the

16

evidence against him. Dr. Auble testified that she believed that the defendant was also susceptible to being intimidated by his codefendants.

The twenty-two-year-old defendant testified regarding the circumstances surrounding his arrest and the statement that he gave to Agent Champine. He said that Agent Champine read him his rights and asked him whether he wanted to tell him what happened. The defendant stated that he understood what was meant by the right to counsel, and the defendant said that he asked Agent Champine whether he could still obtain counsel if he told the police what happened. He testified that Agent Champine told him that counsel would be provided and then began questioning him. The defendant stated that during the interview, he asked Agent Champine again whether he would receive legal representation. The defendant claimed that the reason he asked the questions was that he wanted an attorney. He stated that Agent Champine told him that he should talk to him because he would not get a chance later.

On cross-examination, the defendant testified that he earned average grades during high school and that he graduated from high school. He conceded that he had earlier signed a waiver of rights form, and he admitted that he understood his rights at the time he signed the form. He also stated that he understood when he was told that he was charged with first degree murder and explained his rights before giving the second statement. The defendant acknowledged that the officers did not keep him awake before he was interviewed. He said that he freely and voluntarily told Officer Champine what happened. He stated that he was given an attorney after giving the statement. On redirect examination, the defendant testified that he did not really understand what was meant by the right to counsel or the right to remain silent.

At the conclusion of the hearing, the trial court denied the motion to suppress the statements. It found that the defendant gave the statements knowingly

17

and voluntarily. On appeal, the trial court's findings of fact at the conclusion of a suppression hearing will upheld unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The defendant bears the burden of demonstrating that the evidence preponderated against the trial court's findings. Id. However, the application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Initially, we note that the statement given to Agent Champine was never introduced at trial, either as substantive evidence or for purposes of cross-examining the defendant. Nor does the defendant explain how he was prejudiced by the trial court's denial of the motion to suppress with respect to the statement given to Agent Champine. Under these circumstances, we would not need to concern ourselves about the trial court's rulings with respect to the defendant's second statement that was given to Agent Champine.

However, evidence relating to the first statement that was given to Agent Daniels was introduced at trial both substantively and for purposes of cross-examining the defendant. Agent Daniels testified during the state's case in chief regarding his questioning of the defendant regarding the blood on his shoes. He stated that the defendant told him that the blood was deer blood. The defendant was also questioned on cross-examination regarding the alibi that he and his codefendants concocted. Therefore, the issue of whether the defendant knowingly, voluntarily and intelligently waived his rights before giving the first statement must be addressed.

Initially, we note that the defendant could have been cross-examined regarding the statement he gave irrespective of whether the statement was admissible. A statement which is inadmissible against the defendant in the prosecution's case in

18

chief because of a <u>Miranda</u> violation but which otherwise satisfies legal standards for trustworthiness may properly be used for impeachment purposes to attack the testifying defendant's credibility. <u>Harris v. New York</u>, 401 U.S. 222, 225-26, 91 S. Ct. 643, 645-46 (1971); <u>State v. Hopper</u>, 695 S.W.2d 530, 538 (Tenn. Crim. App. 1985).

However, the state cannot introduce an illegally obtained statement during its case in chief. <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966). Before a defendant can knowingly and voluntarily waive his <u>Miranda</u> rights, the defendant must be "adequately and effectively apprised of his rights." <u>State v. Middlebrooks</u>, 840 S.W.2d 317, 326 (Tenn. 1992). The defendant may waive his constitutional rights as long as the waiver is made "knowingly, voluntarily, and intelligently." <u>Id</u>. The state has the burden of proving the waiver by a preponderance of the evidence. <u>State v. Bush</u>, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his or her <u>Miranda</u> rights, the court must look to the totality of the circumstances. <u>Id</u>.; <u>Middlebrooks</u>, 840 S.W.2d at 326. When the voluntariness of a statement given to police is challenged based on the defendant's competency to waive the rights provided by <u>Miranda</u>, the determinative issue is "whether the defendant had the capacity in the first place to form a will of his own and to reject the will of others." <u>State v. Benton</u>, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988).

The record reflects that Agent Daniels read the defendant his rights and the defendant signed a waiver of rights form before the defendant gave the statement. The defendant testified that he understood what was meant by the right to counsel. Although the defendant is limited intellectually, he does not have a learning disability and is not retarded. In fact, he earned average grades and graduated from high school. We hold that the evidence does not preponderate against the trial court's ruling that the defendant knowingly and voluntarily waived his constitutional rights. We conclude that the trial court properly admitted the statement.

## IV.  ADMISSION OF POST-DEATH EVIDENCE

The defendant contends that the trial court erred by admitting post-death evidence during the guilt and sentencing phases.  He argues that evidence of mutilation of the victim's body is irrelevant to the determination of whether the defendant committed first degree murder.  He asserts that even if the evidence is relevant, the evidence should be excluded under Rule 403, Tenn. R. Evid., because the probative value is substantially outweighed by the danger of unfair prejudice, misleading the jury, and confusion of the issues.  The state responds that the evidence is relevant to the issue of the defendant's culpability and whether the defendant acted under duress.  It contends that the probative value of the evidence of mutilation was not substantially outweighed by the danger of unfair prejudice.  It argues that because the evidence was admissible at the guilt phase of the trial, the defendant's claim that the evidence was inadmissible during the sentencing phase cannot form the basis for relief on appeal.  We hold that the trial court did not err by admitting the evidence.

The admissibility of evidence as more probative than prejudicial is a matter within the trial court's discretion and will not be reversed on appeal absent a showing of an abuse of that discretion.  State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992).  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  If the probative value of relevant evidence is "substantially outweighed by the danger of unfair prejudice," it may be excluded.  Tenn. R. Evid. 403.

We conclude that evidence of mutilation was relevant to the issue of the defendant's guilt.  Our supreme court stated in State v. West, 844 S.W.2d 144 (Tenn. 1992), that evidence of concealment, though not relevant to establish premeditation or deliberation, may be relevant to establish the defendant's guilt by discrediting a claim of

20

self-defense. Id. at 148, 151 (citing Sotka v. State, 503 S.W.2d 212, 220 (Tenn. Crim. App. 1972)) ("an inference may be drawn from the concealment or destruction of the corpse of the deceased"). During opening statement, defense counsel informed the jury that the defendant admitted that he did something wrong but that he should not be held responsible for the killing of the victim. Defense counsel presented several theories that would either reduce or excuse the defendant's commission of the offense, including the defendant acting under duress and suffering from diminished capacity at the time of the offense. The defendant's introduction of evidence of diminished capacity made evidence of the defendant's conduct after the killing relevant to prove that the defendant actively participated in the crime.

We also conclude that the probative value of the evidence of mutilation was not substantially outweighed by the danger of unfair prejudice. Though the evidence of post-death facts was gruesome, it was particularly relevant to show that the defendant was a willing participant in the murder. Given the fact that the evidence was relevant and admissible to the issues to be determined, the trial court did not err by admitting the evidence.

## V. RECUSAL

The defendant asserts that the trial judge erred by refusing to recuse himself from the case. He argues that a recusal was necessary (1) because of a statement made by the trial judge during a pretrial hearing on a motion to suppress the statement of Harris regarding the credibility of TBI Agent Daniels, (2) because the trial judge presided over Harris' trial, and (3) because of an ex parte communication between the trial judge and an assistant district attorney general. He contends that these instances showed the trial judge's bias in favor of the prosecution and against the defendant and caused an appearance of impropriety. Specifically, he argues that an

21

appearance of impropriety with respect to the trial judge acting as thirteenth juror was created by the trial judge sitting for both the defendant's and Harris' trial.

A trial judge should grant a motion to recuse whenever his or her impartiality can reasonably be questioned. Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). Recusal is "warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge would find a reasonable basis for questioning the judge's impartiality." Id. The standard of review on appeal is whether the trial court abused its discretion by denying the motion. State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993).

### A. Comment regarding credibility of witness

First, the defendant asserts that the trial judge should have recused himself because he made statements during a suppression hearing regarding the credibility of TBI Agent Daniels demonstrating a bias in favor of the state and against the defendant. The state contends that the comments made by the trial judge did not warrant a recusal. We agree.

Before trial, the defendant filed a motion to recuse the trial judge. At the hearing on the motion, the defendant argued that a recusal was necessary because of comments made by the trial judge during a suppression hearing regarding the veracity of a witness, Agent Daniels. Agent Daniels had recently been diagnosed with cancer and had been undergoing chemotherapy at the time of the hearing. Agent Daniels' testimony was preserved because of the possibility that Agent Daniels' illness could prevent him from later attending trial. The trial judge made the following comments immediately after ruling on Harris' motion to suppress her statement:

> Lastly, and perhaps as an aside this court cannot set aside, - perhaps some 30 years of knowledge of having Daniels testify, - since he first started as a youngster. He is peculiarly talented, and uncommonly straight forward. This

22

man doesn't have a dishonest bone in his body. You couldn't beat a lie out of him. I have seen him let cases drop out from under him, - before he would even discolor his testimony. I think what he testified to, is precisely what happened out there that day, - and I think that he established the voluntary giving of this statement.

When counsel for Harris asked that the trial judge recuse himself, the trial judge explained his comments as a means of showing his great respect for Agent Daniels' talents.

We agree that the remarks made by the trial judge were not appropriate. See Alley, 882 S.W.2d at 822 ("Remarks which suggest that the judge has taken a position favorable or unfavorable to a party . . . indicate bias."). However, the "issue to be determined is not the propriety of the judicial conduct of the trial judge, but whether he committed an error which resulted in an unjust disposition of the case." State v. Hurley, 876 S.W.2d 57, 64 (Tenn. 1993).

In this case, the defendant was not prejudiced by the trial judge's comments. The trial judge's comments were made pretrial and not in front of the jury. The defendant was tried before an impartial jury who determined the defendant's guilt based upon the evidence presented. Also, the comments were intended to show the trial judge's respect for the work of Agent Daniels, a man in poor health. Moreover, the only portion of the defendant's statements that was introduced substantively was that the defendant claimed that the blood on his shoes was deer blood. We do not believe that the error committed by the trial judge resulted in an unjust disposition of the case. Under these circumstances, we cannot say that the trial judge abused its discretion by denying the motion to recuse.

**B. Presiding over codefendant's trial**

Next, the defendant contends that a recusal was necessary because the trial court presided over the trials of both Harris and the defendant, resulting in the

23

appearance of impropriety in the exercise of his role as thirteenth juror in the defendant's case. The defendant argues that the trial judge could not be fair and unbiased because the judge had approved the verdict of guilt in the trial of Harris. The state responds that the mere fact that the trial judge presided at both trials is insufficient to require a recusal. We agree.

A trial judge is not disqualified from sitting on a case because he or she tried and made findings in previous litigation. King v. State, 216 Tenn. 215, 226, 391 S.W.2d 637, 642 (1965). In King, the trial judge had tried the divorce case of the defendant's wife and granted a decree of divorce upon matters involved in the criminal case, assault with the intent to commit first degree murder. The supreme court held that the trial court properly overruled the defendant's motion to recuse the trial judge, stating that nothing in Article 6, Section 11 of the Tennessee Constitution operated to disqualify the trial judge under the circumstances. Id.

Similarly, the trial judge in this case is not disqualified from sitting on the defendant's case merely because he sat on Harris' case. Although the trial judge heard similar testimony during the codefendant's trial and approved the verdict of guilt against the codefendant, the record does not reflect that the judge was influenced in his decision as a thirteenth juror in the defendant's case by his presiding at the codefendant's trial. Moreover, the central issue at the defendant's trial was whether he acted under duress or whether he suffered from diminished capacity, an issue not before the trial court at Harris' trial. Therefore, we believe that the trial court properly denied the defendant's motion to recuse.

### C. Ex parte communications

Third, the defendant complains that the trial judge should have recused himself because of ex parte communications with an assistant district attorney general.

24

The state argues that the trial court did not abuse its discretion by refusing to recuse himself because the communications were limited to appropriate subjects.

During pretrial discussions regarding discovery, defense counsel stated that the trial court should be aware of the reports that had been sent to the District Attorney General's office because of his ex parte communications with an assistant district attorney general. Defense counsel informed the court that the assistant district attorney general had informed him that the trial judge had telephoned her. At the motion to recuse hearing, the defendant tried to call the trial judge and the assistant district attorney general as witnesses, but the trial judge refused to allow the questioning. However, the trial judge admitted that ex parte communications had taken place, but he assured the parties that the communications did not relate to inappropriate subjects. He explained that he often had ex parte communications with the attorneys in every case, including the defendant's case, but that the communications were limited to appropriate subjects, such as the scheduling of hearings to resolve motions filed by the parties.

Pursuant to the Code of Judicial Conduct in effect at the time of the offense:

> A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. . . .

Tenn. S. Ct. R. 10, Code of Judicial Conduct, Canon 3(A)(4) (1993). In State v. Jones, 735 S.W.2d 803 (Tenn. Crim. App. 1987), this court addressed the appropriateness of an ex parte communication that occurred after the trial had begun. The trial judge in Jones had an ex parte communication with the prosecutor in chambers shortly following voir dire and a heated exchanged concerning a procedural disagreement between counsel. Id. at 810. The trial judge granted the ex parte conference only after the

25

prosecutor assured the judge that the purpose of the conference was to discuss matters not pertaining to the case on trial. Id. This court stated that the trial court's decision to grant an ex parte communication was lacking in judgment. Id. at 810 n.3. However, any error was considered harmless given (1) the trial court's reassurance that the ex parte conference did not concern matters relating to the case, (2) the lack of a showing of prejudice, and (3) the matter took place entirely out of the presence of the jury. Id. at 810.

Similar to Jones, there has been no showing of prejudice in this case. The trial judge assured the defendant that he did not speak to the assistant district attorney general regarding inappropriate matters. The record reflects that the trial judge's conversations related to scheduling matters involving motions.[3] Moreover, the jury was not made aware of the trial judge's ex parte communications. Under these circumstances, we are unable to say that the decision to deny the motion to recuse was an abuse of discretion.

## VI. CONSTITUTIONALITY OF THE FELONY MURDER STATUTE

The defendant contends that the trial court erred by denying his motion challenging the constitutionality of the felony murder statute when read in conjunction with the statutory provisions providing for criminal responsibility for the conduct of another and for the facilitation of a felony. He also argues that the prosecutor abused his discretion by seeking the death penalty because the prosecutor could have charged the defendant instead with facilitation of first degree murder. The defendant acknowledges that the prosecutor has wide discretion in seeking the death penalty, see State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994). However, he argues that this case

---

[3] We note that the Code of Judicial Conduct presently allows ex parte communications where the circumstances require it for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits, provided that (1) the judge reasonably believes that no person will gain a procedural or tactical advantage, and (2) the judge promptly notifies all other parties regarding the substance of the ex parte communication and allows an opportunity to respond. See Tenn. S. Ct. R. 10, Code of Judicial Conduct, Canon 3(B)(7)(a)(i) and (ii) (amended 1997).

is distinguishable because, similar to <u>State v. Middlebrooks</u>, 840 S.W.2d 317, 346 (Tenn. 1992), the class of death eligible defendants are not restricted by the prosecutor seeking the death penalty instead of charging the defendant with facilitation of first degree murder.

We first note that the defendant did not receive a death sentence. Second, we note that the defendant was found beyond a reasonable doubt to be criminally responsible for the criminal acts charged, not a mere facilitator. Thus, the arguments he raises in this issue are irrelevant to what actually occurred in this case. His claimed errors had no bearing on the outcome. This issue is without merit.

## VII. DISMISSAL OF A JUROR

The defendant contends that the trial court erred by excusing a sitting juror from the case after testimony had begun in the trial. After TBI Agent Alvin Floyd and Subway Manager May Dill testified, the trial court dismissed the juror because she was unable to make arrangements for the care of her eight-year-old daughter during the trial in which the jurors were to be sequestered. The defendant argues that it was an abuse of discretion to dismiss the juror. The state responds that the trial court's actions were proper. We agree.

During voir dire, the trial court asked the potential jurors whether they had any personal or family problems that would interfere with service on the jury that was to be sequestered for approximately ten days. In response, the juror stated that she was a single parent and that as a single parent, she was required to take her daughter to school and to pick her up from the day care after school. She explained that she did not have anyone to do these things for her other than her mother. She said that her mother could not pick her daughter up until after 8:00 p.m. because she was working that week. When asked by defense counsel whether the problem with child care would

27

be a problem, the juror conceded that she would be worried but stated that she would be able to give her undivided attention to the case.

During a bench conference after some peremptory challenges had been made, the trial court stated that the juror had a legitimate reason for being excused for cause, but it also recognized that both the prosecution and the defense believed that she would be a good juror. At that time, defense counsel objected, stating that the dismissal should have occurred before challenges were made. The prosecutor then stated that he agreed with the trial court that the juror's position was an impossible one, although he liked the juror. Defense counsel asserted that a dismissal was not proper and that the state should be required to exercise a peremptory challenge. The trial court then decided not to dismiss the juror. Additional challenges were made, and the juror was selected to serve on the jury. That afternoon, opening statements were given, and Agent Daniel and Ms. Dill testified.

At the beginning of next day, the trial court conducted a bench conference concerning the juror's child care problem. The court informed the parties that the juror had been unable to make arrangements for the care of her daughter. It explained that the juror's only relatives that lived locally were her mother and father, but her parents had contacted the court and stated that they could not care for the juror's daughter because they had conflicts with work. Defense counsel objected to the dismissal of the juror on the grounds that the juror was properly selected and that defense counsel preferred her over the alternate juror.

Upon trial court questioning, the juror explained that one of her parents would have to take off from work in order to care for her daughter. The juror stated that her mother could keep her daughter no longer than the rest of the week. The trial court stated that its concern was that the juror would worry about her daughter while serving

28

on the jury.  The court dismissed the juror, stating that it was convinced that the juror had done everything to obtain alternative child care and that requiring the juror to serve would cause an undue burden on her.  The juror was then replaced by an alternate juror.

Pursuant to Rule 24(e), the trial court may allow alternate jurors to replace sitting jurors who "become or are found to be unable or disqualified to perform their duties."  The decision to seat an alternate juror is within the trial court's discretion. State v. Millbrooks, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991).  The defendant has the burden of showing prejudice by the trial court's seating of an alternate juror.  State v. Max, 714 S.W.2d 289, 294 (Tenn. Crim. App. 1986).  The defendant has a right to a fair trial at the hands of an impartial jury, but such a right does not include the right to any particular jurors.  See State v. Smith, 857 S.W.2d 1, 20 (Tenn. 1993).

In this case, the juror could only obtain child care for the rest of the week, although the trial court estimated that the jurors would be sequestered for approximately ten days.  The trial court concluded that the juror's inability to obtain child care rendered the juror unable to fulfill her duties as a juror.  Under these circumstances, we cannot say that the trial court abused its discretion by dismissing the juror and replacing her with an alternate juror.  Moreover, the defendant accepted the impanelling of the alternate jurors.  He makes no claim that the alternate juror who replaced the juror in question was less than impartial.  Therefore, the defendant has failed to show how he was prejudiced by the use of the alternate juror.  We hold that the trial court did not err.

### VIII.  SPECIAL REQUESTS FOR JURY INSTRUCTIONS

The defendant complains that the trial court improperly denied eleven of the defendant's twelve special requests for jury instructions, two of which relate to the defense of duress and eleven of which relate to diminished capacity. He argues that the instructions as given by the trial court do not adequately cover the applicable law. He also contends that the trial court erred in the manner in which it instructed the jury regarding his special request for a diminished capacity instruction. The state responds that the trial court properly denied the defendant's special requests and that the defendant was not prejudiced by the manner in which the jury was charged regarding diminished capacity.

A trial court has a duty to give a complete charge of the law applicable to the facts of the case. State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). However, Tennessee law does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. State v. West, 844 S.W.2d 144, 151 (Tenn. 1992).

## A. Duress

The defendant asserts that his special requests for instructions relating to the defense of duress should have been given. The state responds that the requests were properly denied as the instructions given adequately covered the law with respect to the defense of duress. We agree.

Both of the defendant's special requests concerned the consideration of diminished capacity in determining whether the defendant acted under duress. The first instruction requested by the defendant states:

> I further charge you that as to the defense of duress, the duress need not be actual. However, even if such duress was not actually existing as the time as alleged above

30

existing, the defendant has the right to rely upon the defense of duress if such actions by another are reasonably perceived by the defendant to amount to duress, having in mind the defendant's diminished capacity, if any you should find.

The second special request by the defendant is as follows:

> Because of his diminished capacity, a person may have been mistaken based upon his perception of the circumstances as to the extent of his actual duress. But if he acts under duress from honest, even though mistaken, conviction as to the extent of danger to him, he will not be held criminally liable for his actions.

The trial court denied the special requests and instructed the jury regarding the defense of duress as follows:

> Also included in the defendant's plea of not guilty is his plea that his acts constituting the offense charged were the result of duress.
>
> Duress is a defense to prosecution where:
> (1) the defendant is threatened with harm which is present, imminent, impending and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done;
> (2) the threatened harm is continuous throughout the time the act is being committed;
> (3) the harm is one from which the defendant cannot withdraw in safety; and
> (4) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

See T.P.I.-Crim. 40.03 (4th ed.). The instruction given by the trial court is virtually identical to the definition of duress provided under T.C.A. § 39-11-504.

The state argues that the statutory description of the requirement of harm turns on an objective showing of the existence of harm and not on a showing of a subjective perception of the existence of harm. It asserts that as a result, the defendant's subjective perceptions are irrelevant to the determination of whether the defendant acted under duress, and therefore, the defendant was not entitled to instructions that the jury was to consider the defendant's mental deficiencies in determining his ability to perceive the nature of the harm.

31

We agree with the state that the defendant's state of mind is irrelevant to the defense of duress. The statute providing for the defense of duress states:

> Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

T.C.A. § 39-11-504(a).

Notably, the defendant's mental state is not an element of the defense under the statute. The defense of duress is not supported by evidence that the defendant was mistaken as to the circumstances due to his diminished capacity. Rather, the defense of duress requires a showing that the threatened harm was "present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done." T.C.A. § 39-11-504(a). In this vein, we also note that the first duress instruction requested by the defendant contains an incorrect statement of law in that it states that the defendant may rely upon the defense of duress even if such duress was not actually existing. Thus, the trial court properly denied the defendant's two requests for additional instructions on duress.

In conclusion, we hold that the defendant was not entitled to instructions that the jury was to consider the defendant's "diminished capacity" in determining whether the defendant acted under duress. In any event, the instructions given to the jury on diminished capacity and duress were sufficient to convey the applicable law to the jury.

32

## B. Diminished capacity

The defendant contends that the trial court improperly denied his special requests for instructions relating to diminished capacity. He argues that the diminished capacity instruction as given by the trial court does not accurately reflect the law as set forth in State v. Phipps, 883 S.W.2d 138 (Tenn. Crim. App. 1994). He also argues that the trial court erred in the manner in which it instructed the jury regarding diminished capacity because the identification of the instruction as that of the defendant's allowed the jury to view the instruction as being less important or to disregard the instruction altogether.

Before trial, the defendant requested ten jury instructions relating to diminished capacity to supplement the diminished capacity jury instruction to be given by the trial court. The requested jury instructions are summarized as follows:

> (3) "Diminished capacity means a disturbance of mental or physical capacity which would lessen the ability of the defendant to form the intent or to knowingly or recklessly commit the act. Diminished capacity is that state of mind of the defendant preventing him from possessing the required culpable mental state necessary to make out the offense charged and/or any of the lesser included offenses." The jury must acquit the defendant if they find that the defendant suffered from diminished capacity to the extent that he could not have possessed the requisite culpable mental state.
>
> (4) The jury may consider the opinion of expert or lay testimony in determining whether the defendant suffered from diminished capacity.
>
> (5) The state is required to prove beyond a reasonable doubt that the defendant was not suffering from diminished capacity once defendant presents proof of diminished capacity.
>
> (6) The jury may convict the defendant of a lesser crime if they find that he suffered from diminished capacity.
>
> (7) The jury must acquit the defendant of felony murder if they find that he suffered from diminished capacity.
>
> (8) The jury must find the defendant not guilty of the offense charged if they are unable to find beyond a reasonable doubt that the defendant possessed the culpable mental state.

33

(9) The jury may consider the defendant's diminished capacity in determining whether the defendant had the requisite culpable mental state required for the underlying felonies for the charge of felony murder.

(10) The jury must acquit the defendant if it is not shown that the defendant acted intentionally or knowingly with respect to the underlying felonies.

(11) The jury must acquit the defendant of felony murder if they find that because of his diminished capacity, he did not intentionally or knowingly commit the underlying felonies. The jury may consider the defendant's diminished capacity in determining whether the defendant knowingly or intentionally committed the underlying felonies.

(12) The jury must find that the killing was knowingly or recklessly committed, and the jury may consider the defendant's diminished capacity in determining whether the defendant acted knowingly or recklessly.

The trial court denied all but requested instruction number nine.

In its initial jury charge during the guilt phase of the trial, the trial court instructed the jury regarding diminished capacity as follows:

Testimony as to a defendant's mental capacity may be considered by you to show that he was incapable of forming the specific culpable mental state required for any particular offense.

At the close of the initial charge, the trial court asked the parties whether there was anything further. At that time, the following colloquy took place in the presence of the jury:

[DEFENSE COUNSEL]: Yes, Your Honor, our special requests for instruction.

THE COURT: Ladies and gentleman, at the request of the Defendant, I further charge you that with respect to the crime of the killing in the perpetration of kidnapping, robbery, or theft, the actions of the defendant must have been knowing and with intent insofar as the commission of the underlying felony is concerned. If you find that because of diminished capacity or for any other reason the defendant did not knowingly or with intent, commit the kidnapping, robbery or theft, then such underlying felony cannot be the basis for the conviction of first-degree murder and you must acquit the defendant of that charge.

34

> In this respect, you may consider the diminished capacity of the defendant in determining whether he knowingly or intentionally committed the kidnapping, robbery or theft. If you find the defendant had diminished mental capacity at the time of this offense, you may consider this in deliberating whether he had the required culpable mental state.

After the jury began its deliberations, the defendant objected to the manner in which the court instructed the jury regarding diminished capacity.

Tennessee law permits the introduction of evidence regarding the defendant's mental condition for the purposes of negating the requisite mental state for the offense charged. Phipps, 883 S.W.2d at 149. Diminished capacity is not a defense to a crime; rather, it is a rule of evidence allowing the introduction of evidence of the defendant's mental condition to negate the requisite culpable mental state. State v. Hall, 958 S.W.2d 679, 688-89 (Tenn. 1997); Phipps, 883 S.W.2d at 143. Recently, our supreme court cautioned against the introduction of evidence that the defendant suffered from a mental disease or defect as proof of "diminished capacity." Hall, 958 S.W.2d at 690. Instead of proffering the evidence as proof of "diminished capacity," the evidence should be presented as being relevant to negate the existence of the culpable mental state required to establish the criminal offense charged. Id. However, with respect to the obligation to give a jury instruction, "Tennessee law does not require the trial judge to instruct the jury that expert testimony may be considered in determining whether the requisite mental state existed." Phipps, 883 S.W.2d at 151.

We conclude that the trial court was not obligated to give any additional instructions relating to the jury's consideration of evidence of the defendant's mental condition as it related to his ability to form the requisite mens rea. The instructions requested by the defendant were either incorrect statements of the law or they were fully and fairly covered by the instructions given by the trial court. We believe that the instructions given by the trial court relative to diminished capacity adequately conveyed to the jury that it may consider evidence of the defendant's diminished capacity in

35

determining whether the defendant had the requisite culpable mental state for felony murder.

For his claim that the trial court erred by telling the jury that the diminished capacity instruction given by the court was the one requested by the defendant, the defendant relies upon State v. Edward T. McConnell, No. 163, Washington County (Tenn. Crim. App. Jan. 3, 1983), app. denied (Tenn. Mar. 14, 1983). In McConnell, this court recognized that "the better practice is to incorporate specially requested jury instructions into the general charge of the court . . ., else there is danger they may be considered by the jury as merely the contentions of one of the parties." Id. at 11. The court held that for there to be a reversal, however, it must be shown that the failure to incorporate the requested instruction into the charge affected the outcome of the trial. Id. at 12.

Though we agree that the trial court should have incorporated the special request into the general charge, we believe that the defendant has failed to show that the verdict was affected by the manner in which the trial court gave the instruction. See T.R.A.P. 36(b); Tenn. R. Crim. P. 52(b). Irrespective of the trial court's characterization of the instruction as one requested by the defendant, it was given as a mandate by the trial court as a relevant proposition of law for the jury's consideration. Moreover, the jury was aware that the diminished capacity instruction was being given at the request of the defendant because defense counsel informed the trial court in the presence of the jury that it had forgotten to give the defendant's special request for instruction. We conclude that no prejudice arose from the trial court's error relating to the manner it instructed the jury regarding diminished capacity.

## IX. AGGRAVATING CIRCUMSTANCES

The defendant challenges the jury's application of the aggravating circumstances. He argues that the evidence is insufficient to support their application. Also, with respect to the avoiding arrest or prosecution aggravating circumstance under T.C.A. § 39-13-204(i)(6), the defendant argues (1) that the jury applied the aggravating circumstance based upon the uncorroborated testimony of Smothers, (2) that the aggravating circumstance cannot be applied constitutionally because the defendant was not the one who shot the victim, (3) that it requires a showing of intent, motive or premeditation to kill the victim to avoid capture, arrest or conviction, and (4) that it fails to narrow the class of death-eligible defendants under Middlebrooks. The state responds that the evidence is sufficient to support the jury's application of the aggravating circumstances and its imposition of a sentence of life without the possibility of parole. It also argues that the avoiding arrest or prosecution aggravating circumstance was constitutionally applied.

### A. Heinous, atrocious or cruel aggravating circumstance

The defendant contends that there is no evidence to show that the murder was heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See T.C.A. § 39-13-204(i)(5). He argues that absent any evidence of post-death facts, the two shotgun wounds were insufficient to support the application of the aggravating circumstance beyond a reasonable doubt. The defendant also argues that there is insufficient evidence to corroborate Smothers' testimony. We disagree.

Pursuant to T.C.A. § 39-13-204(i)(5), the jury may find as an aggravating circumstance that the "murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Torture is defined as the infliction of severe physical or mental pain upon the victim

while he or she remains alive and conscious. State v. Odom, 928 S.W.2d 18, 26

(Tenn. 1996). In Odom, our supreme court stated that:

> it must be assumed that the legislature intended the words 'serious physical abuse' to mean something distinct from 'torture.' The word 'serious' alludes to a matter of degree. The abuse must be physical as opposed to mental, and it must be 'beyond that' or more than what is 'necessary to produce death.' 'Abuse' is defined as an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.'

Id.

Viewed in the light most favorable to the state, Cabbage, 571 S.W.2d at 835, a rational juror could find beyond a reasonable doubt the existence of this aggravating circumstance. The evidence showed that after the defendant and his codefendants stopped the victim, the defendant grabbed the victim and threw him to the ground. Harris then slapped and cursed the victim and told him to shut up. The victim was forced into the back of the truck and the defendant drove the truck away. Smothers then shot the victim in his left hip with a shotgun, injuring the victim's intestines and large blood vessels. When the victim screamed and begged for his life, he was told to shut up. Medical care was not obtained for the victim, though the victim was told that he would be taken to a hospital. Instead, the defendant continued to drive and as they approached street lights, the victim began to scream for help. Smothers then took the shotgun, loaded it, stuck it under the victim's chin, and shot the victim, killing him. We believe that these facts are sufficient to establish torture and to support the jury's finding that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See State v. Bland, 958 S.W.2d 651, 660-61 (Tenn. 1997) (victim shot once in leg and remained alive, conscious, in pain, and pleading for help for approximately ten to fifteen minutes after he was shot several more times in the leg). Also, as earlier noted, there is sufficient evidence to corroborate Smother's testimony.

### B. Avoiding arrest or prosecution aggravating circumstance

The defendant also alleges that the evidence is insufficient to support the application of the avoiding arrest or prosecution aggravating circumstance. Pursuant to T.C.A. § 39-13-204(i)(6), the jury is permitted to consider that the "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." The prevention of arrest or prosecution need not be the dominant motive for the murder. State v. Smith, 868 S.W.2d 561, 581 (Tenn. 1993). Rather, it is sufficient that at least one of the motives for the murder was to avoid, interfere with, or prevent the lawful arrest or prosecution of the defendant or another. Id. at 580-81.

We conclude that a rational trier of fact could have found the existence of this aggravating circumstance beyond a reasonable doubt. In the light most favorable to the state, the proof showed that after the defendant's truck overheated, the defendant and his codefendants devised a plan to take the next vehicle that came along. They also discussed the possibility that the vehicle's occupants would have to be killed. According to their plan, Harris stood in the middle of the road and flagged down the victim. Once the victim stopped the truck, Smothers got the shotgun the defendant had earlier obtained at Harris' request and had placed in the defendant's truck. Smothers pointed the gun at the victim and told him to get out of the truck. Then, the defendant grabbed the victim and threw him to the ground while Harris cursed and slapped the victim and told him to shut up. The victim was then placed in the back of the truck with Smothers while the defendant drove the victim's truck and Harris held the gun on the victim through the rear sliding glass window of the truck.

When Smothers grabbed for the gun as the defendant increased his speed, the gun discharged, hitting the victim in his left hip. The victim began screaming but was ordered to be quiet. As street lights became visible, the victim began

screaming again. Then, Smothers heard a voice telling him to shoot the victim, and Smothers complied. We believe that it was reasonable for the jury to infer that one of the reasons that Smothers shot the victim was to prevent someone from hearing the victim's screams for help in order to avoid detection. As we noted earlier, there is sufficient evidence to corroborate Smother's testimony. The evidence supports the application of this aggravating circumstance beyond a reasonable doubt.

Next, the defendant argues that the avoiding arrest or prosecution aggravating circumstance may not be applied because he did not shoot the victim. Under the facts of this case, we disagree. This court has previously addressed a similar issue. In William E. Groseclose v. State, No. 02C01-9407-CR-00145, Shelby County (Tenn. Crim. App. Aug. 23, 1995), app. denied (Tenn. Feb. 5, 1996), a post-conviction case, the petitioner had been convicted as an aider and abettor of first degree premeditated murder for hiring two men to kill his wife. The jury sentenced him to death, finding that the aggravating circumstance that the killing was heinous, atrocious, or cruel applied, although the petitioner was not the person who actually killed the victim. The petitioner challenged the vicarious application of the aggravating circumstance, asserting that it could not be considered because the petitioner did not commit the actual killings.

On appeal from the denial of post-conviction relief, the petitioner relied upon Omelus v. State, 584 So.2d 563 (Fla. 1991), a murder for hire case that holds that the heinous, atrocious or cruel aggravating circumstance cannot be applied vicariously when there is no evidence to show either that the defendant directed the codefendant to kill the victim in the manner in which the murder was accomplished or that he had any knowledge of how the murder would be accomplished. However, this court distinguished Omelus because of the petitioner's participation in the planning and preparatory steps to the murder itself. Groseclose, slip op. at 6-7.

40

Similar distinguishing features exist in the present case. A review of the state's evidence reflects that the defendant actively participated in the planning and in the nature of the killing. The defendant obtained the shotgun for the trip. When their initial plans to find David Hampton were hampered by the overheating of his truck, the defendant and his codefendants devised a plan to take the victim's truck and also discussed the possibility that the victim would have to be killed. Smothers then used the defendant's shotgun to force the victim in the back of his truck, and the defendant drove the victim's truck away. The victim was then shot in the hip by Smothers. Although the defendant was driving the truck, he did not take the victim to receive medical attention. Later, when the victim began screaming for help as they approached street lights, Smothers shot the victim in the head, killing him, after hearing a voice tell him to shoot the victim. Based upon the defendant's active participation in the crime, it was proper for the jury to rely upon the aggravating circumstance to enhance the defendant's sentence to life imprisonment without the possibility of parole.

The defendant also argues that the state failed to show that Smothers had the intent, motive or premeditation to kill the victim in order to avoid capture, arrest or conviction of the defendant or another. As previously noted, though, the facts of this case demonstrate the existence of such a motive in killing the victim. From the participants discussing the possibility of killing their robbery victim to Smothers shooting the victim when he screamed for help, it was reasonable for the jurors to conclude beyond a reasonable doubt that Smothers shot the victim to avoid being caught.

With respect to the defendant's claim that the avoiding arrest or prosecution aggravating circumstance fails to narrow the class of death eligible defendants similar to Middlebrooks, we first note that the defendant was not sentenced to death. This court has held that a felony murder sentence may be enhanced to life imprisonment without the possibility of parole by using the commission of a felony

aggravating circumstance, because <u>Middlebrooks</u> is only concerned with the constitutional narrowing needed for the death penalty. <u>State v. Frederick D. Butler, et al.</u>, No. 02C01-9604-CR-00128, Shelby County (Tenn. Crim. App. Mar. 19, 1997), <u>app. granted</u> (Tenn. Nov. 3, 1997); <u>see also State v. Danny Ray Lacy</u>, No. 02C01-9701-CC-00013, Madison County, slip op. at 21-22 (Tenn. Crim. App. Nov. 24, 1997), <u>app. filed</u> (Tenn. Jan. 20, 1998) (First degree murder by aggravated child abuse enhanced to life imprisonment without parole because of reckless killing of a child under sixteen years old. T.C.A. § 39-13-202(a)(4)); <u>but see State v. James Lloyd Julian, II</u>, No. 01C01-9511-CV-00371, Loudon County, slip op. at 16-17 (Tenn. Crim. App. July 24, 1997), <u>app. filed</u> (Tenn. Oct. 30, 1997) ("We do not believe the legislature intended to except those receiving life without parole from the protections against double enhancement afforded those receiving death and those receiving lesser sentences."). We note that in <u>Lacy</u>, Judge Wade wrote separately to explain that he agreed with <u>Julian</u>, not <u>Butler</u>. However, a majority of our panel agrees that the <u>Middlebrooks</u> holding is not implicated when a sentence of life imprisonment is imposed, as in this case.

In any event, we believe that avoiding arrest or prosecution is not an element of felony murder and is not necessarily implied in every felony murder. Also, as previously indicated, when the killing of the victim is for the purpose of avoiding arrest or prosecution, such a purpose reflects an intent to kill. Such an intent narrows the class of felony murderers subject to life imprisonment without the possibility of parole. We conclude that the jury was justified in sentencing the defendant to life imprisonment without the possibility of parole under the circumstances of this case.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
Joseph M. Tipton, Judge

42

CONCUR:

_____
Gary R. Wade, Presiding Judge

_____
Paul G. Summers, Judge